All right, here ye, here ye, here ye, this Honorable Appellate Court of the 2nd District is back in session. Pursuant to adjournment, the Honorable Anne Brackley Jorgensen presents. Please be seated. Your Honor, this is the second case in the morning called 211-677, People of the State of Illinois v. Ryan A. Schiller. On behalf of Mr. Schiller, Paul Glazer. On behalf of the people, Diane Campbell. Are both sides ready to proceed? I'm ready. Good morning, guys. Good morning. May it please the Court. Ryan Schiller appeals his conviction for the offense of first-degree murder, a case arising out of a bench trial in Winnebago County. The first issue here is whether the evidence failed to prove Mr. Schiller guilty of first-degree murder, the Honorables will doubt, or whether the evidence at most established that he was only guilty of a lesser offense of involuntary manslaughter. The difference between the two offenses, of course, lies in the mental state of the defendant. And as is often the case in situations like this, where the defendant and the victim are pretty much alone in a room at the same time, the only evidence of the state of mind usually comes from the defendant. And, in fact, my client here offered his statements in a five- or six-hour video interrogation that was part of the record. It had been at trial. Our position is that the judge's conclusion that there was no evidence of recklessness was not a rational finding, particularly because of testimony from the state's own expert, pathologist Larry Bloom. This is not the usual case where the pathologist takes a stand and testifies and offers his conclusions based on the injuries and the cause of death suffered by the victim to establish, to corroborate the state's theory of the case. Here, the state's theory was that the defendant caused Amanda Reed to die by asphyxia by placing his knee on her back while she was facedown in bed, and that he knew such acts created a strong probability of death or great bodily harm when he did them. Dr. Bloom confirmed that Reed died from asphyxia caused by the knee on her back, but most notably he also testified he refuted any claims that the acts which caused the death, while the acts themselves were intentional or voluntary in themselves, that the death itself was an intentional act. How could he testify to that? Well, because he had sat through or conducted more than 9,000 autopsies for more than 30 years. He had seen all kinds of deaths in his experience. But at the time he made that determination, Mr. Glazer, he didn't have the other facts that were present to the trial court during the bench trial, did he? No. I'm pretty sure he didn't see the defense testimony or defense video statement, which again showed a lack of any knowledge. But he didn't know the facts about the shirt and the dumpster and didn't know the facts or hadn't heard the testimony from the other witnesses with respect to their relationship and what had occurred that evening? Well, first of all, let me approach those in order. The shirt and the dumpster, all the after the fact, after the incident conduct, doesn't show what my client's state of mind was at the time of the act. We have cases like the, I call it the famous Llewellyn case, where the woman drives her husband from out of Ogle County or somewhere out west or south all the way to Chicago for four or five hours, offering four or five different explanations of what happened and why her husband died, when in fact the cause of death was a number of loss of blood through various stab wounds. The Supreme Court reversed that conviction, saying after the fact inconsistencies, don't establish your state of mind at the time of the act. In this case, his immediate conduct, according to his statement, was that as soon as Amanda quieted down, his intent was to quiet her down, as soon as she quieted down, he tried mouth to mouth and chest compressions, as best he could. He didn't have any training, but he did the best he could. His action in terms of the T-shirt or driving back to work or home, again, it shows some panic, but it never shows what he was feeling and thinking at the time of the actual incident. What Dr. Bloom saw was no marks, saw marks on her body consistent with mutual combat. He testified she didn't die. She was not beaten to death. He also saw no indication of any strangulation or anything around her neck, which would indicate that the defendant strangled her. She died consistent with the state's theory when the defendant put his knee in her back and caused her to lose consciousness. But I guess my question is how can he testify that when he put his knee in her back that he should not have known that those actions created a strong probability of death or great bodily harm? When you have a person's face face down into a pillow or face down into a mattress, I guess my question is absent everything else that the trial court have heard, how does he testify to that? He testifies to that because he'd never seen that. He'd never seen a murder. As he said in his words, traumatic asphyxia was not real high up there, it's his words, as far as committing murder, that people don't do this. People know when you're strangling someone, like in the Leach case, which I have to mention was decided this morning. I have no idea what the ruling was, but the Supreme Court was coming out with the decision at 9 o'clock this morning. But in the Leach case, whichever way it goes, in the Leach, the defendant there was convicted of first-degree murder for strangling his wife or ex-wife, whatever, girlfriend. And there was testimony that to strangle someone to death, you have to have your hands on the neck for two and a half minutes, whatever. People know that when you do that to someone, it's going to cause death of great bodily harm. Yeah, even if you don't intend to cause death of great bodily harm, correct? Right, right. And, again, it's knowing not intentional. And I realize the charge here was knowing murder and not intentional. But the putting the knee in the back, the manner in which she died was not a manner that people would know would be that dangerous an act. And just as in, you know, I go back to the DiVincenzo and Jones cases that we cited. Both of those cases, the defendants had reasons to not like the person that they hit. In DiVincenzo, the guy was jealous about an old girlfriend or something, and he struck the victim in the head a couple times, causing the victim to fall to the ground and die. That was ruled to be an involuntary manslaughter, even though he didn't like the guy and they didn't know that just by plugging the guy in the jaw a couple times, he was going to kill him. In Jones, we have a similar situation. The defendant catches his wife or girlfriend with another man in his apartment. He starts a fight with the guy. He pulls him outside the backyard. You know, fisticuffs ensue. He slugs him. He knocks and keeps him from escaping. Knocks him down, puts his foot on the victim's neck long enough to cause him to lose consciousness. He didn't like that guy either, but the first district said, you know, there was never any conscious awareness that the death of Gabriel Harmon was certain to result from that foot to the neck. Here, there's no evidence that my client didn't like Amanda Reed. They had a very close relationship. Yeah, it was a little rocky, according to Amanda's girlfriends who testified, but there was no indication that he wanted to kill her. It was irrefuted that he wanted to calm her down because she started some fight. And again, Dr. Bloom's testimony that it was not intentional, again, the state never refuted that either. But again, we're talking about intent as opposed to knowing actions. The doctor opined regarding intent to kill. I've never seen this with an intentional murder. Like, I'm going to kill that guy, therefore I'm going to hold his head down into a pillow. But this is a different situation. This is not charged A-1. It's charged A-2. Did the defendant, or actually, could the trial court rationally find that the defendant knew his actions were likely to cause death or grapevine in the head? When the judge said there was no evidence of recklessness, that was when he crossed the line from rationality to irrationality. There was evidence of recklessness. And the not knowing that by putting his knee in her back, by not knowing that was why it was a reckless act as opposed to a conscious awareness that by doing that he was practically certain to kill her or cause great bodily harm to her. Let me read a quote to you. The circuit court was not required to believe that a 185-pound man placing all of his weight on a 55-pound 9-year-old boy while pushing the boy's face into a pillow did not intend to kill the boy or did not know that his acts created a strong probability of death or great bodily harm. The court believing that the defendant committed the acts admitted in the statement was entitled to infer the requisite mental state. Why is that different here? Why couldn't the trial court in this case, based upon the facts I read, which are strikingly similar to this, why couldn't the trial court rationally infer the requisite mental state? And I'm reading from People v. Edmonds, the Illinois Supreme Court case. Because there's no evidence here that, you know, in the Edmonds case, the defendant in that case had an element of wanting to cause that child some harm. He wanted to sexually assault the child and he wanted to keep the child quiet so the child's mother wouldn't hear. Here, we have the defendant's statement who said, I wanted to calm her down. I wanted to make sure she stopped kicking and screaming and all that. What's different? There's also a great difference in the weight. One of the cases I cite in my case and in my brief talks about the factors that one looks at as a disparate size between the defendant and the victim. You've got Edmonds, a guy at 180 versus a child who's 50. There's obviously a great difference here. Here, my client may have been able to talk out what those height was, but with all due respect to Amanda Reed, she was not a frail, small. She was .27 alcohol content. She also had that, too. I'm getting to that. Okay. That she certainly was capable of defending herself somewhat. And the bruises on my client show that she got her licks in as well. Now, we also have a situation where Amanda Reed had a .27 alcohol content. She had some evidence of THC in her body as well as some pseudoamphetamines. Now, I'm not saying she was taking amphetamines or whatever she was taking, but Bloom said, well, the equivalent of one gram or one tab of pseudoamphetamine. Maybe she had an allergy. I don't know. But she still had enough in her body that Bloom said would have affected her ability to make her judgment, her consciousness, her breathing ability. And the effect on her breathing, she died from asphyxiation. She didn't breathe. So the combination of my client's need, together with her blood alcohol and her THC and everything else she's got in her body, made her passing out that much more likely. So there's that difference there. But Dr. Bloom testified that it took a few seconds to a few minutes for her to die. So, you know, he continues knowing that she's not able to breathe, arguably. Well, he also said that it would have been possible for her to keep breathing for a minute or two after she was asphyxiated. It's hard to understand that, but that's what the doctor seemed to say, which would have given more reason to believe that my client didn't just leave a dead person in the room. He thought she was still alive, and then he left. So there is enough in this case to show that he consciously disregarded a substantial and unjustifiable risk, but not that he was consciously aware that by doing this he was going to kill her. He wasn't trying to kill her. He wasn't trying to harm her. He was trying to simply calm her down. And it was a combination of circumstances, his need, together with her condition, that caused her to die. And that's why it's an involuntary manslaughter. It's a tragedy. It's a homicide. Your burden is to show that the trial court was irrational in its finding. And I think there is enough evidence on this record for that finding to be an irrational finding. There was evidence of recklessness. Judge Pamelia just didn't see it. Judge Pamelia goes on to the second issue in the case, which we're asking for a resolution of a question that was left unanswered. Does the fact that the trial judge's daughter is a Facebook friend of the victim's sister constitute an impropriety that should have led to the judge accusing himself? Did anybody file a motion for substitution of judge? No. Did anybody raise it after the judge said, they said, judge, your daughter is Facebook friends with the victim's sister? And the judge says, oh, okay. Right. Did anybody raise it? Well, my client raised it, got his attorney to raise it. When? At that time, at the sentencing hearing, when the attorney said, your Honor, I have to say this. My client wants me to say this, and reveals the claim. Now, is there a motion for substitution? No, there is not. So did they comply with section 114.5? No. No. No. Absolutely not. But the problem is that the constitutional conduct, rule 62, provides that a judge has to avoid even the appearance of impropriety. Appearances count. That's what rule 62 says. Right. But how about O'Brien? Pardon me? How about N. Ray O'Brien? Even the judge could have ended all this by responding to the claim, no, that's ridiculous. That would have ended it. If there's any analogy, maybe it's the analogous to me, a crank kind of situation, where a defendant makes a claim, it's not a, it's a common law kind of a claim, and the court's saying, oh, if the judge hears that the defendant's complaining about something, at least make an inquiry. Ask a question. Let's resolve this before we go any farther. In this case here, had Judge Pamelia simply said, no, that's ridiculous, I don't know that Pamelia's daughter is friends with the victim's sister. I don't know if Pamelia's daughter has a Facebook account. I don't know if Pamelia's daughter has a daughter, or what his relationship with the daughter might be. But the claim was not beyond the realm of possibility here. It wasn't like my client said, well, your attorney says, well, my client says he doesn't like you because you came from Mars. Well, that's obviously ridiculous. It's absurd. The judge could certainly just, let's go on. But making an allegation like this, when appearances count, they count in the state, they count in terms of the age we live in. When people are losing their faith in all levels of government, appearance is very important. And all a judge had to do here was simply respond to that and say, no, I don't talk to my sister or my daughter. I don't look at Facebook. This is ridiculous. Let's go on. That would have been it. We wouldn't have raised this issue. But by saying no to them. With nothing other than an alleged possible appearance of impropriety. Hey, your daughter has a Facebook and your daughter is friends with the victim's daughter. And then he says, oh, nice. And he moves on. And nobody stopped and said, hey, wait a minute, judge. I want you to address that issue. Nobody did that. Going back to my Supreme Court case of Saldivar, which seems to recognize that in that case the issue was whether the judge's reference to an inherent factor in sentencing is improper. The Supreme Court seems to acknowledge that we don't expect attorneys to interrupt the judge when he's talking. And here we have. I never stopped you before, did I? This morning in point. I just bought the record reflect I stopped right there. We have Mr. Polito, who's an able attorney, but a young attorney who's doing his best for his client in front of the judge. He doesn't want to see his client get banged in a sentence. And he wants to be very above board and not insult the judge. I don't want to insult the judge either. But I think the judge owes us or the public an explanation. That's what we're asking. We're asking for reversal. We're asking the case to go back. This court wants to retain jurisdiction. Finally, to go back for a hearing or for a proceeding at which the familial could explain for the record or offer a response to that claim on the record. And if the claim is a clean claim, it comes back here and there's nothing more. The case is over. But if he doesn't offer more, then obviously the familial should have accused himself at that point. The way the comment came up, he was not asked for a response. Basically, the defense attorney, according to the transcript, said, my client wants me to inform you of this. And then just, it was actually kind of somewhat embarrassed, apparently. Again, I think it's because lawyers are embarrassed to make this kind of claim before the judge. But the point again remains that. But when we have a comment that's made that's not asked for a response, and we have the presumption of impartiality, and the trial court very willingly said, this is so frivolous, it's not even worth a response. Had he said that, we would not be here today. But what he said was, let's go to sentencing. Thank you. Let's go to sentencing. And that's not a response. The Code of Professional Responsibility, whose responsibility, if you will, is it to raise that with respect to substitution of judge based upon Emory O'Brien? The judge. The judge. I would say it's the judge's responsibility. It's not the defendant that cannot raise that. The defendant can only file a motion for substitution of judge. I'd like to hold our judges to a higher standard and to say that if someone alleges in court and open court on the record that there's a problem here, because of 7-2 saying not just you but your family have to be above reproach, the judge has to make a response. So your whole point is it doesn't matter what the nature of the allegation was. It was that some allegation is raised that, if true, might impact the appearance of the defendant. I think the nature of the allegation does count. Again, obviously, if you're accusing a judge of being from Barra, it's crazy. Right, but your point was, regardless, it is the failure to respond that we should find was error. Yes. Regardless of the nature of the allegation. But the allegation here also, another contextual concern here, this was not just a regular case. At the very start of this case, there is some connection between Amanda Reed and her family and the legal community. In fact, the state's attorney in this case filed a motion to withdraw. I appointed a special prosecutor to try this case. So people, there is, we don't know from this record. Wait, wait, wait. So you're telling me then we have to read into that that there was some connection between this victim and the judge? I'm saying that the allegation, the nature of the allegation was not a frivolous allegation. So your argument here is that the judge should have recused himself regardless of whether he should have responded or not responded. No. My position is that because of the nature of the allegation here in the context of the facts of this case, the judge had an obligation to explain the allegation to refute it or to recuse himself if, in fact, there was an impropriety. So you're suggesting then that the judge should have said, yes, my daughter has a Facebook account or not. Yes, she is friends or not friends. And let's assume both of those were in the affirmative. My daughter has a friend relationship with the sister of the victim. Is that enough for him to have recused himself? I think he then has to take the next line and say, but it doesn't affect me here. I didn't talk to my daughter about this case. And this was at sentencing? This was at the last hearing, before sentencing. So he had heard all the trial evidence. He had heard everything. Yes. And he said as the trier of fact. So in T.W., your daughter is friends with the victim's sister? That's an appearance of impropriety that deserves some comment, some response from the judge. But nobody requested any comment? Well, I think my client was, in effect, requesting it, but his attorney didn't know how to make the request. So is it the nature of the allegation or is it the failure to respond? It's both. I think it's both. I think the nature, you can't ignore, the allegation doesn't occur in a vacuum. And the nature of the allegation here, which is not a frivolous allegation, needs a response. Is there anything about the timing of this that we should be concerned about? The fact that your client didn't say, I just learned about this, I just found out. Just, hey, judge, your daughter's friends with the victim's sister. I think this can be analogized to a crankle, that if it comes up, the judge has to, in that case, the judge makes an inquiry. Here the judge should explain for the record how accurate or inaccurate that claim might be. And what do you base that on? What case do you base that on? Well, there's been no outright case that's talked about Facebook yet. There's certainly a Florida ethics opinion that we cite, the Bradshaw case we cite. But is there any case that says once somebody mentions something, that it's incumbent upon the court to address it? Well, I can't cite to a case that directly says that. But I can only cite to the Rule 62, and if O'Brien says... And again, it's only raised by the judge. It can only be raised by the judge, according to In re O'Brien. Well, but it could be raised by the judge. But here, if the defendant raises the claim on the record, at a hearing on the record, the judge should respond. I don't think it's asking too much of the judge to tell... What it's asking a lot is not the issue. Where is the obligation of the trial court at this stage in the proceedings, after there's already been a finding of guilt, and we are all ready to go to sentencing? Where's the obligation for the court to do this? Just the rule that avoid appearance of impropriety? I wouldn't say just the rule. I'd say the rule. I'd say the rule matters. And appearances of impropriety matter a lot. And that should be enough. And again, for case law, the Bradshaw case, where the judge is seen talking to a deputy sheriff during a break in the proceedings, and then we learn later that as soon as it's learned that the deputy is the mother of the victim in the case, the judge shoots the deputy away from the room. That was enough. The judge didn't do anything bad there. The deputy came to the judge and created the problem. But the appellate court refers to granted in trial in that case too. Isn't there a difference, though, that would be the equivalent here would be the daughter coming to the judge and saying, gee, my friend is the victim's sister? Is that right? And if we had more of a factual development of this issue, we could answer that question. But we couldn't because the judge just said, let's go on. I don't want to just go on. I think we should ask just for a million to explain what happened. For that reason, those reasons, Your Honor, we ask that my client's conviction be reduced to non-cap manslaughter or the alternative of remand for further hearings. Thank you. Thank you, Mr. Grazer. Your Honors, my name is Diane Campbell. I'm from the appellate prosecutors representing the people of the state of Illinois. I'm going to briefly address the Facebook issue and move on to the more substantive issue. Here I think the judge's lack of response was itself a response. This is such a nebulous allegation. Defense counsel says he's uncomfortable bringing it up, but his client has insisted, so he in fact raises it. But it is that the defendant heard from some unnamed person at some unnamed time that apparently the judge's daughter was a Facebook friend of the victim's sister. I don't know how many degrees of separation you need or are there, but it's four or five. Defense counsel did not pursue and ask for any sort of comment after that. So that doesn't even create the appearance of a provider? It does not. In any creation of the appearance of propriety, it's the judge or, I believe in one case, a juror who took an action where they spoke to someone. It is not the fact that perhaps the judge's daughter might have been a Facebook friend of the victim's sister. Those are degrees of separation that don't create any appearance of impropriety, which is not the standard we have here. Do you think that it's relevant that counsel, neither counsel nor his client, insisted on some sort of a response? There was a lack of insistence? I think it is. Clearly they've waived any sort of error claim on that. It would have been quite easy for counsel or if the defendant apparently had had a conversation with his attorney just before it was brought up, had the defendant then leaned over to his attorney and whispered further instructions, something might have happened. If the defense counsel had thought it was worth pursuing and was not frivolous, he could have said something. But I envision perhaps some eye-rolling by the judge or something that would indicate that he does not take this as a serious or anything but a frivolous allegation. I don't think he was obliged in any way to respond to something so nebulous. Is there an obligation on a trial judge or a judge at any level for that matter to oversee Facebook conversations by members of their family? I can't imagine that that would not come under some sort of freedom of speech problem. I have not seen it raised. I cannot see how this or any court could rule that a trial judge has to monitor his family. They may say something about what the trial judge himself can do on Facebook. But they cannot rule, and no one should, what the judge's family does. You might have a hard time in letting my kids know they have to show me their Facebook. I'm not even allowed on it. Yes. I'll go on to the first issue then. I think Judge Justice Shostak had a good point in that we have Dr. Bloom offering testimony about the defendant's state of mind, which is itself a little problematic. But if you do go with looking at Dr. Bloom's comments, you need to take them in context. And the defendant has set them out in his brief on page 19, where Dr. Bloom has said that this is an unusual method of intentional murder. While it may be unusual, it was nonetheless effective because we have the dead body to prove that. So if we were talking about an intentional murder, obviously it is possible, not impossible. However, what the defendant was charged with was, as the court says in DiVincenzo, knowing acts create the strong possibility of death or, and what we're concerned with, great bodily harm. So it's the great bodily harm. He did not have to intend to kill Amanda Reed. Okay. You are familiar with the facts in Jones. How do you distinguish Jones from this case? He didn't cover her nose and mouth. Yes, actually. In this case, well, can I add one comment before I address that? Dr. Bloom's further testimony, and this is in, I believe, the second answer paragraph on page 19 of the defendant's brief. I think the injuries were intentional. So in this case, on page 18 of the defendant's brief. He said, I think the injuries were intentional, but the death was not. Correct. But we're alleging that the defendant knew that his acts created the strong possibility of great bodily harm. So if he intended to injure her and create bodily harm, he is, in fact, guilty of murder. On page 18 of the defendant's brief, the defendant notes that Dr. Bloom was certain that Reed died from traumatic asphyxia, a deprivation of oxygen caused by some external force. And on page 17 of the defendant's brief, it talks about the defendant's action, which is holding her face down on the bed and ultimately putting his knee on her back when she lost consciousness. And then he continues. So what we have is the defendant holding the victim down on a soft surface, holding her face to the mattress so that it's molded to her face and she can't breathe. He puts his knee on her back, which further restricts her breathing. His intent is to incapacitate her and hold her eventually until she loses consciousness. I think that that is, in fact, he has the knowledge that those actions will create the strong possibility of great bodily harm, and that is what happened here. Dr. Bloom said he intended the injuries, and that is what needs to be proven, and that is what the judge went on. Furthermore, I don't think the judge acted irrationally. Although your honors can watch the video as well as the trial judge did, there was testimony by the other witnesses, such as Amanda's friend, who said that she had no injuries when she left her that evening just before the defendant went in. The defendant testifies repeatedly in his taped confession that she had a split lip and that it was bleeding before he ever got there. So the defendant's credibility, the judge, I think, said it was slim to none. Clearly, he does not believe the defendant's testimony about the struggle and the self-defense, and that is a big factor to take into his finding for the intentional murder rather than involuntarily manslaughter. There's also the defendant's subsequent acts, such as he did not summon aid. This is something in the Leach case that the court considered. They said, you know, although it's laudable that the defendant there tried to perform CPR or resuscitation, that just indicated that he knew that his acts created the strong possibility of harm. Here we have the defendant did not summon aid. He did not text or call the victim the next day, as was his want. He got rid of the shirt he was wearing. When he came back the next day, he had his friends circle the block before dropping him off. So that all goes to show the defendant's state of mind, which is that he knew there was the acts that he did created the strong possibility of great bodily harm. And as I said- Strong probability, right? Excuse me? Probability? Yes. Again, how do you distinguish Jones? You didn't distinguish that, and you agree. In this case, I think the case is more similar to Leach and to the case that Justice Burke referred to, which is Edmonds. We have the defendant pressing the victim's face down into the mattress. That's restricting her breathing. Her death was caused by asphyxiation, which is the lack of the ability to breathe. That's compounded with the knee going onto the back. And I think that is distinguishable. That's what sets this case apart. Did that? If this was a jury trial, would this evidence have warranted a jury instruction for involuntary? I would say probably, simply because usually the standard for giving a jury instruction is any evidence. And the defendant would argue that he did not intend to kill her. As a matter of caution, had I been the trial judge, I would have probably given the instruction. Obviously, the judge did consider the two factors. It was a large part of the defense counsel's argument. So I cannot see, you know, I think the judge acted appropriately in considering it, but he acted even more appropriately in rejecting that. What about some of the comments about the variance in weight and size and the factors that we look to regarding recklessness versus known conduct? I think it is a big factor. As you correctly pointed out, she has a blood alcohol level that is very high. Her ability to resist him was impaired by that and the fact that she is face down on the bed. The doctor noted that all the defendants, or all of her injuries, noted the severity of the injuries on her neck and on her back. There's extensive bruising and abrasions. I think that goes to show that clearly, and Dr. Bloom's testimony that the injuries were intentional go to show the defendant knew that his acts were creating the great bodily harm. What's the standard of rebuke? Well, you have to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements. I believe that's clearly proven here. The judge knew the standard. I believe that one of his comments was that it was not only proven beyond a reasonable doubt, but, you know, further than that. I can't remember exactly where. I think that might have been in the post-trial motion. But again, just to reiterate, Dr. Bloom testified the injuries were intentional. The defendant said that his acts were intentional. He was pinning the victim down to the bed, pinning her head, put his knee on her chest. His objective was to incapacitate her and make her stop struggling. The way you're going to do that is if you lose consciousness or you're so severely hurt and restricted that you stop struggling. So clearly he did intend his acts, and he knew that there's a stronger possibility if you're pushing someone to unconsciousness of great bodily harm. If you have any more questions. Thank you. Do you wish to reply? Just going to the Facebook issue real quick first. In the O'Brien case, there are some significant distinctions between O'Brien here. Obviously, in O'Brien there was a motion for substitution here. There was not. But that also distinguishes that case from this. In that case, there was a motion for substitution. There was an evidentiary hearing, and there was a ruling saying there was no impropriety. And the Supreme Court is saying the appearance of impropriety is not the standard because there has to be some actual prejudice here because we've had this hearing to determine there is no prejudice. That's fine. But in Ray O'Brien, they filed a motion for substitution under 114. You're asking, you're saying, oh, well, the judge should sua sponte bring it up under section 62 or, in this case, the fact that the defense attorney made this comment, it should have triggered section 62. Correct? Well, I don't think I said the judge should sua sponte bring it up. Oh, by the way, my daughter has a Facebook account. But that's on 62 sex. Well, the point is the defendant did bring it to the judge's attention, and the judge had the sua sponte duty to explain, to address the claim. That's, I guess, my response. But my difficulty with that is you're talking about recusal, and that's a judge's decision, and they never have to justify why you do or you do not recuse yourself. Why would we deviate from that rule? Because the modern age of social media networks and Rule 62 demands that, demands more of the judge. And because of the allegations stated spread of record, the judge could simply have responded to that claim. But I'm not, where's the obligation to do that? You're asking us to impose on a trial judge an obligation that up to today does not exist. The decision to recuse or not recuse is without comment. You can. You can say, you know, a couple steps up in front of you, defense in the state, and, gee, that's my former partner. I'm going to recuse myself on this because whatever. But I don't have to. And so where do I, as an appellate court, get the authority to tell trial judges that regardless of what the rule says and regardless of existing case law, you now have to state on the record your thought process in deciding whether or not to recuse based on something that the defendant says? Well, I think that there's no case law that prevents this court from saying to remand this case to Judge Familia to explain, to respond to the claim. I think that's entirely within the authority of this court, even based on O'Brien. Because, again, O'Brien, there was an evidentiary hearing. There's no, we don't, and again, we're not asking for reversal based on this. I can't ask for reversal based on what we have in this record. But just have the judge explain why. But you brought up a point, and thank you for being a good sport when I busted on that. But you brought up a point where, you know, a lawyer doesn't want to interrupt a judge. How about, couldn't we also argue, Mr. Glazer, that the defense attorney felt that this was such a preposterous allegation that he wasn't even going to raise it? And so he moved on. If he truly thought it was so preposterous, he shouldn't even have said anything. The fact that he said it, and somewhere in his mind, there's, boy, there is something here. Or maybe he had a client standing next to him and said, hey, you know, I think being a defense attorney, you know, you probably had clients say, I want you to say this to the judge. And you're thinking, oh, gee, really? But you did, because your client wanted you to. So couldn't you argue, couldn't reasonably we argue that in this case maybe the defendant brought this up? Like your opponent says, it's five degrees of separation. My, your daughter is Facebook friends with this girl or that girl, whatever. And the defense attorney felt, all right, he wants me to mention it, I'll mention it. And when the judge passed it, he probably thought, you know what, I'm going to let it go, because it's silly. I'm concerned about the option of saying this is not a big deal, a judge can simply ignore it. I think that the public, I think that the judiciary owes it to itself to explain away allegations like this to remove any stigma of impropriety. In order to establish that, though, there would also have to be an obligation on the trial judge to have some knowledge and or control over the Facebook page of their family members, which I don't have. Which, if Pamelia had said that, that would be the end of the story. But he didn't. Well, he doesn't have to restate every law or every outgrowth of freedom of expression. That's, my family can say whatever they want. Well, true, but if somebody alleges in court that something's wrong, I think the judge has to respond. We'll briefly go on to the reason for that issue. Judge Fink says it's problematic here, the blue law, for actual testimony about the defense state of mind. Nothing so problematic about that. Pathologists testify about whether injuries show a possibility of a certain state of mind. Were these injuries, can you tell if these injuries were intentionally inflicted? Pathologists do that all the time. What makes this unusual here is that the pathologist is supporting the defense in this case. The pathologist also made it clear at page 460 that Emanuely was not beaten to death. He talked about abrasions and contusions. Abrasions and contusions are basically scratches and small bruises. She was not beaten to death. Last point, as far as whether the injuries were intentional, whether the injuries were the results of voluntary acts, whether the punching was intentional, it was intentional in DiVincenzo. It was intentional in Jones. But in both of those cases, the reviewing courts concluded the evidence didn't support first-degree murder convictions, and that's what we're asking for here. And you believe, based upon the standard of review, we have every right to reverse this case? Absolutely. Well, or reduce it. Reduce it. Reduce it. Yes. Thank you. All right. Thank you for reviewing. Recess until 10-30.